IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHER DISTRICT OF ILLINOIS
EASTERN DIVISI(

| | | |
|---|---|---|
| [SEALED] | ) | 22-CV-3863 Judge Rebecca R. Pallmeyer |
| | ) | Cas Magistrate Judge Jeffrey Cummings |
| Plaintiff/Relator | ) | Direct |
| | ) | Chief Judge Rebecca Pallmeyer |
| | ) | Magistrate Judge |
| vs. | ) | |
| | ) | |
| | ) | FILED UNDER SEAL AS REQUIRED BY 31 U.S.C. § 3730(b)(2) |
| [SEALED] | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | JURY TRIAL REQUESTED |
| | ) | |
| | ) | |

FILED
JUL 26 2022 SH
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**COMPLAINT**
**FOR VIOLATIONS OF THE FALSE CLAIMS ACT,**
**31 U.S.C. § 3729 *et seq.***

**The ILLINOIS FALSE CLAIMS ACT ("IFCA"),**
**740 ILCS 175/1, et seq.; and the**

**ILLINOIS INSURANCE CLAIMS FRAUD PREVENTION ACT ("IICFPA")**
**740 ILCS 92/1**

**THE ANTI-KICKBACK STATUTE, 42 U.S.C. 1320a-7b**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel., BREANNA MITCHAM, Plaintiff, | Case No. |
| v. | Chief Judge Rebecca Pallmeyer<br>Magistrate |
| LIFESCAN LABS OF ILLINOIS, LLC, LEGACY NURSING AND REHABILITATION, SYMPHONY CARE NETWORK, ELEVATE CARE, WARREN BARR SOUTH LOOP, WARREN BARR NORTH SHORE, WARREN BARR LIVING AND REHAB, WARREN BARR LINCOLNSHIRE, WARREN BARR LINCOLN PARK, UPTOWN CARE CENTER, THE GROVE OF SAINT CHARLES, THE GROVE OF SKOKIE, THE GROVE OF NORTHBROOK, THE GROVE OF LAGRANGE PARK, THE GROVE OF FOX VALLEY, THE GROVE OF EVANSTON, THE GROVE OF ELMHURST, THE GROVE AT THE LAKE, SYMPHONY OF SOUTH SHORE, SYMPHONY OF ORCHARD VALLEY, SYMPHONY OF LINCOLN PARK, SYMPHONY OF JOLIET, SYMPHONY OF HANOVER PARK, SYMPHONY OF CRESTWOOD, SYMPHONY OF CHICAGO WEST, SYMPHONY AT ARIA, SYMPHONY AT 87TH ST., PINE ACRES REHAB & LIVING CENTER, PETERSON PARK HEALTHCARE, MAYFIELD HEALTH CENTER, LAKEFRONT NURSING & REHAB, ELEVATE CARE WAUKEGAN, ELEVATE CARE RIVERWOODS, ELEVATE CARE NORTHBROOK, ELEVATE CARE NILES, ELEVATE CARE IRVING PARK, ELEVATE CARE CHICAGO NORTH, CLARK MANOR, CHALET LIVING & REHAB, CARLTON AT THE LAKE, BELLA TERRA WHEELING, BELLA TERRA STREAMWOOD, BELLA TERRA MORTON | **FILED UNDER SEAL AS REQUIRED BY THE FALSE CLAIMS ACT**<br><br>**JURY TRIAL REQUESTED** |

GROVE, BEACON CARE CENTER, AVANTARA PARK RIDGE, AVANTARA LONG GROVE, AVANTARA EVERGREEN PARK, ASTORIA PLACE, APERION CARE WILMINGTON, APERION CARE WESTCHESTER, APERION CARE WEST RIDGE, APERION CARE WEST CHICAGO, APERION CARE TOLUCA, APERION CARE ST. ELMO, APERION CARE SPRINGFIELD, APERION CARE SPRING VALLEY, APERION CARE PRINCETON, APERION CARE PLUM GROVE, APERION CARE PEORIA HEIGHTS, APERION CARE OAK LAWN, APERION CARE MORTON VILLA, APERION CARE MIDLOTHIAN, APERION CARE MASCOUTAH, APERION CARE MARSEILLES, APERION CARE LITCHFIELD, APERION CARE JACKSONVILLE, APERION CARE INTERNATIONAL, APERION CARE HIGHWOOD, APERION CARE GLENWOOD, APERION CARE FOREST PARK, APERION CARE FAIRFIELD, APERION CARE EVANSTON, APERION CARE ELGIN, APERION CARE DOLTON, APERION CARE CHICAGO HEIGHTS, APERION CARE CAPITOL, APERION CARE BURBANK, APERION CARE BRIDGEPORT, APERION CARE BRADLEY, APERION CARE BLOOMINGTON, APERION CARE ANGOLA, APERION CARE ARBORS AT MICHIGAN CITY, APERION CARE DEMOTTE, APERION CARE FORT WAYNE, APERION CARE FRANKFORT, APERION CARE KOKOMO, APERION CARE MARION, APERION CARE PERU, APERION CARE SPENCER, APERION CARE TOLLESTON PARK, APERION CARE UNIVERSITY PARK, AND APERION CARE WALDRON, and ELIYAHU KUTOFF, YOSTEF MEYSTEL, Individuals

Defendants.

## Complaint

NOW COMES Plaintiff-Relator BREANNA MITCHAM ("Relator" or "Mitcham"), by and through her attorneys, against Defendants LIFESCAN LABS OF ILLINOIS, LLC. ("Lifescan"), ELIYAHU KUTOFF ("Kutoff"), and the Defendants listed in the caption, above, on behalf of the UNITED STATES OF AMERICA and the STATE OF ILLINOIS, and states as follows:

## Nature of the Case

1. Plaintiff-Relator, Breanna Mitcham brings this action under the *qui tam* provisions of the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729*, et seq.*, the Illinois False Claims Act ("IFCA"), 740 ILCS 175/1 *et seq.*, and the Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/1, *et seq.* ("IICFPA"), to recover damages and civil penalties from Defendants LIFESCAN LABS OF ILLINOIS, LLC. ("Lifescan"), *et al.*

2. As set forth herein, Mitcham worked for Lifescan, a laboratory services provider in Skokie, Illinois, from September 2020 to March 2022 as its Director of Billing. In this position, Mitcham oversaw the entirety of the Company's revenue cycle, with her staff of about ten direct and forty indirect reports. As such, she has firsthand knowledge that Defendants defrauded the Federal Government, the State of Illinois and private insurance companies in the following ways:

a) Lifescan and Kutoff provided Defendant nursing homes, with which it shares common ownership and familial interests, Covid tests for their employees at below-market rates in exchange for laboratory referrals for the nursing homes' residents (who were beneficiaries of federal healthcare programs) in violation of the FCA and AKS' remuneration in exchange for referrals prohibition;

b) Lifescan and Kutoff knowingly forged physician signatures and supplied made-up diagnoses with claims for laboratory tests that were submitted to U.S. Health Resources and Service Administration's (HRSA), Medicare, Medicaid and private insurers;

c) Lifescan and Kutoff knowingly submitted claims to HRSA's program for Covid testing services for uninsured individuals to patients who were covered by private insurance providers and falsely certified they were uninsured;

d) Lifescan and Kutoff knowingly submitted claims for laboratory services which contained false and incorrect patient identifiers (i.e., names and social security numbers);

e) Lifescan and Kutoff knowingly submitted claims for Covid testing services provided to nursing home employees and residents that were also paid, or that should have been paid, by Federal grants that were awarded to the nursing home clients for the same services; and

f) Lifescan knowingly submitted claims for covid testing swabs that it did not perform.

3. Mitcham repeatedly opposed these practices to Kutoff throughout her employment and to Elena McGannon, Lifescan's Chief Revenue Officer who was hired in December 2021, and she refused to implement some of these practices. On March 24, 2022, Defendants terminated her employment in retaliation for her opposition in violation of the FCA's anti-retaliation provisions and Illinois law.

4. The Relator is an original source within the meaning of 31 U.S.C. § 3730(e)(4)(b) and has direct and independent knowledge of the factual allegations underpinning these claims by virtue of her position with the Defendants and her supervision over Lifescan's revenue cycle.

5. Pursuant to 31 U.S.C. § 3730(b)(2), Relator has provided the Government with a copy of the Complaint and a written disclosure of substantially all material, evidence, and information in her possession.

## Jurisdiction and Venue

6. This Court has jurisdiction over the subject matter of this action pursuant to 31 U.S.C. §§ 3730(b)(1) and 1331, and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

7. This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. §§ 3732(a), 3730(b) and because they transacted business within this district and have committed acts within the district that violated 31 U.S.C. § 3729. This Court has jurisdiction over the subject matter of this action pursuant to 31 U.S.C. §§ 3730(h) and 1331.

8. Venue is proper in this Court pursuant to 31 U.S.C. §§ 3732(a), 28 U.S.C. §§ 1391 and 1395(a) because at all times relevant to this Complaint Defendants regularly conducted business within this district and maintained employees and/or offices within this District. In addition, statutory violations alleged herein occurred in the Northern District of Illinois.

9. This action is not based on a public disclosure. It is based on information that is within the direct and independent knowledge of the Relator. Relator has provided that information to the Government prior to filing this action.

## Parties

10. Mitcham is an Illinois resident. She worked for Lifescan as its Director of Billing from on or about September 28, 2020, until on or about March 24, 2022. In this capacity she oversaw and implemented all functions related to the company's revenue cycle, including billing to and collections from federal, state and private insurance payors, auditing medical records,

onboarding new clients, cash applications, and ad hoc reporting. She supervised approximately ten domestic employees whose job titles were lead, supervisor and specialist. She also oversaw the work of approximately forty contractors who were based in South Africa and who primarily performed data entry functions for the Company.

11. Lifescan Labs is a full-service laboratory that performs in-house molecular testing for third-party clients. It is located at 5255 W. Golf Rd., Skokie, IL 60077. The company has existed since 1996. Kutoff, its current CEO, and his business partners purchased it in about 2019. According to its website, Lifescan is "among the largest laboratories in the nation." The majority (75%) of its clients are nursing homes, including the Defendants named herein. Its website states it has "provided laboratory services for over 400 long-term care facilities." See, https://www.lifescanlab.com/about/. It also provides Covid testing services to restaurants, camps and car dealerships.

12. Yosef Meystel is part-owner of Lifescan. He also owns Aperion Care Nursing Homes, one of Lifescan's largest clients. Apperion operates 37 nursing homes in Illinois and Indiana.

13. Lifescan and Kutoff also have a common ownership and interests with the Legacy nursing home group and Elevate nursing home group, as described herein.

14. The following Defendants are nursing homes and nursing home groups that entered sub-market agreements with Lifescan (for Covid testing of nursing home employees) in exchange for laboratory referrals to Lifescan (for laboratory tests for the nursing homes' residents), as described in the allegations below: Legacy Nursing And Rehabilitation, Symphony Care Network, Elevate Care, Warren Barr South Loop, Warren Barr North Shore, Warren Barr Living And Rehab, Warren Barr Lincolnshire, Warren Barr Lincoln Park, Uptown Care Center, The Grove Of Saint

Charles, The Grove Of Skokie, The Grove Of Northbrook, The Grove Of Lagrange Park, The Grove Of Fox Valley, The Grove Of Evanston, The Grove Of Elmhurst, The Grove At The Lake, Symphony Of South Shore, Symphony Of Orchard Valley, Symphony Of Lincoln Park, Symphony Of Joliet, Symphony Of Hanover Park, Symphony Of Crestwood, Symphony Of Chicago West, Symphony At Aria, Symphony At 87th St., Pine Acres Rehab & Living Center, Peterson Park Healthcare, Mayfield Health Center, Lakefront Nursing & Rehab, Elevate Care Waukegan, Elevate Care Riverwoods, Elevate Care Northbrook, Elevate Care Niles, Elevate Care Irving Park, Elevate Care Chicago North, Clark Manor, Chalet Living & Rehab, Carlton At The Lake, Bella Terra Wheeling, Bella Terra Streamwood, Bella Terra Morton Grove, Beacon Care Center, Avantara Park Ridge, Avantara Long Grove, Avantara Evergreen Park, Astoria Place, Aperion Care Wilmington, Aperion Care Westchester, Aperion Care West Ridge, Aperion Care West Chicago, Aperion Care Toluca, Aperion Care St. Elmo, Aperion Care Springfield, Aperion Care Spring Valley, Aperion Care Princeton, Aperion Care Plum Grove, Aperion Care Peoria Heights, Aperion Care Oak Lawn, Aperion Care Morton Villa, Aperion Care Midlothian, Aperion Care Mascoutah, Aperion Care Marseilles, Aperion Care Litchfield, Aperion Care Jacksonville, Aperion Care International, Aperion Care Highwood, Aperion Care Glenwood, Aperion Care Forest Park, Aperion Care Fairfield, Aperion Care Evanston, Aperion Care Elgin, Aperion Care Dolton, Aperion Care Chicago Heights, Aperion Care Capitol, Aperion Care Burbank, Aperion Care Bridgeport, Aperion Care Bradley, Aperion Care Bloomington, Aperion Care Angola, Aperion Care Arbors At Michigan City, Aperion Care Demotte, Aperion Care Fort Wayne, Aperion Care Frankfort, Aperion Care Kokomo, Aperion Care Marion, Aperion Care Peru, Aperion Care Spencer, Aperion Care Tolleston Park, Aperion Care University Park, and Aperion Care Waldron.

**The False Claims Act**

15. The FCA prohibits knowingly presenting, or causing to be presented, to the federal government a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1).[1] In addition, the FCA prohibits knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B). The FCA further prohibits knowingly concealing or knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property back to the federal government. 31 U.S.C. § 3729(A)(1)(G).

16. The FCA also prohibits conspiring with another person to defraud the Government by getting a false or fraudulent claim allowed or paid by the Government. 31 U.S.C. § 3729(A)(1)(C ).

17. The term "knowingly" as used in the FCA means that a person, with respect to information, (i) has actual knowledge of the information, (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b). No proof of specific intent to defraud is required to show that a person acted knowingly under the FCA. *Id.*

18. Any person who violates the FCA is liable for civil penalties up to $11,000 per false claim prior to November 2, 2015, as adjusted for inflation, plus three times the amount of damages

---

[1] Congress amended the FCA as a part of the Fraud Enforcement Recovery Act of 2009 ("FERA") on May 20, 2009, making certain amendments retroactive, including 31 U.S.C. § 3729(a)(1)(B). It amended the FCA as part of the Patient Protection and Affordable Care Act on March 23, 2010.

that the Government sustains as a result of the defendant's actions. 31 U.S.C. § 3729(a). These civil penalties increase to up to $21,563 per false claim for claims submitted after November 2, 2016 and including treble damages. 28 C.F.R. §85.5.

19. A violation of the Anti-Kickback Act is a per se violation of the FCA. 42 U.S.C. § 1320a–7b(g).

**The Anti-Kickback Statute**

20. The Anti-Kickback Statute ("AKS") was designed to prevent conflicts of interest arising between and among referral sources and other health care providers and entities. 42 U.S.C. § 1320a-7b(b).

21. The AKS prohibits a person or entity from "knowingly and willfully" paying remuneration to another person or entity to induce the recipient to, inter alia, refer an individual to a person or entity for the purpose of furnishing a service or item paid for by a federal health care program. 42 U.S.C. § 1320a-7b(b)(2).

22. A person found to have violated the AKS is subject to criminal and civil sanctions, including exclusion from participation in federal health care programs. 42 U.S.C. §§ 1320a-7b(b)(1)–(2), 1320a-7a(a)(7), 1320a-7(b)(7).

23. The AKS prohibits the payment, in any form, whether direct or indirect, made in part or in whole to induce or reward the referral or generation of federal health care business. The AKS prohibits the offer or payment of "anything of value" in return for referrals. A "thing of value" is defined broadly to include payment in cash or kind. The AKS extends equally to the solicitation or acceptance of payments and to offers to pay and to actual payments for referrals. The AKS was enacted because of Congressional concerns that payments made in return for referrals would lead to overutilization.

24. In addition to prohibiting payments designed to induce referrals, the AKS prohibits the entity receiving a prohibited referral from presenting or causing to be presented to Medicare any claim for referrals that are induced by kickbacks. In 2010 the AKS was amended to provide that a claim that includes items or services resulting from kickback violations are deemed "false" under the FCA. 42 U.S.C. § 1320a-7b(g).

25. In 2010, the Patient Protection and Affordable Care Act of 2010 ("PPACA") amended the AKS to clarify that a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of the False Claims Act. 42 U.S.C.§ 1320a–7b(g).

26. Compliance with the AKS is a condition of payment for both Medicare and Medicaid.

27. The United States, through the Department of Health and Human Services (DHHS), administers the Supplementary Medical Insurance Program for the Aged and Disabled established by Part B, Title XVIII, of the Social Security Act under 42 U.S.C. § 1395j-1395w ("Medicare Part B Program"). The objective of the Medicare program is to provide medical insurance for covered services to any person 65 years or older, to certain disabled person, and to individuals with chronic renal disease who elect coverage under the program. DHHS has delegated the administration of the Medicare Program to its component agency, the Centers for Medicare and Medicaid Services ("CMS").

28. The Medicaid Program is a joint federal-state program formed under Title XIX of the Social Security Act. 42 U.S.C. 1396 et seq. As a prerequisite to enrollment as a provider in the Medicaid Program, medical providers are required to enter into provider agreements and agree,

among other things, to comply with federal and state provider participation requirements as a condition of federal and state funding. 42 U.S.C. § 1396a(w).

29. Part B of the Medicare Program is a 100% federally subsidized health insurance system for disabled persons or persons who are 65 or older. Eligible persons aged 65 or older may enroll in Part B of the Medicare Program to obtain benefits in return for payments of monthly premiums as established by DHHS. The benefits covered by Part B of the Medicare program include medical treatment and services by physicians. An enrolled individual who obtains a covered medical service can either pay for the medical service himself, and request reimbursement of 80% of the reasonable charge, or assign the right to reimbursement to the physician providing the service, who collects as an assignee of the beneficiary under 42 U.S.C. § 1395(b)(3)(B)(ii). The funds to reimburse claims for reimbursement originate from the Medicare Trust Fund.

30. Medical treatment and services by physicians are generally reimbursable under the Medicare Part B Program if the services provided are reasonable and medically necessary. The physician or entity seeking reimbursement, however, must meet certain obligation. These obligations include the following duty to:

a. Bill Medicare for only reasonable and necessary medical services. 42 U.S.C. § 1395y(a)(1)(A);
b. Not make false statements or misrepresentations of material facts concerning requests for payment under Medicare. 42 U.S.C. § 1320a-7b(a)(1) & (2); 1320a-7; 1320a-7a;
c. Provide economical medical services, and then, only where medically necessary. 42 U.S.C. § 1320c-5(a)(1);
d. Provide evidence that the service given is medically necessary. 42 U.S.C. §1320c-5(a)(3);
e. Assure that such services are not substantially in excess of the needs of such patients. 42 U.S.C. § 1320a-7(b)(6) & (8);
f. Not submit or cause to be submitted bills or requests for payment substantially in excess of the physician's usual charges for the same treatment or services. 42 U.S.C. § 1320a-7(b)(6)(A);
g. Certify when presenting a claim that the service provided is a medical necessity. 42 U.S.C. § 1395n(a)(2)(B); and

h. Not as a matter of billing policy waive co-payment amounts in violation of the federal anti-kickback and self-referral statutes. 42 U.S.C. § 1320a-7a(a)(5); 42 U.S.C. § 1320a-7a(i)(6).

**The Illinois False Claims Act**

31. The Illinois False Claims Act makes it unlawful to (A) knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval; (B) knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim; or (C) conspire to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G).

32. The State of Illinois administers Medicaid through the Illinois Department of Healthcare and Family Services (DHFS). The United States provided funds to the State of Illinois through the Medicaid program, pursuant to Title XIX of the Social Security Act, 42 U.S.C. §1396 et seq. The FMAP for the State of Illinois, the percentage of Illinois Medicaid funds contributed by the federal government, is 50%.

33. Enrolled providers of medical services to Medicaid recipients, including Defendants, are eligible for and have in fact collected reimbursement for covered services submitted for payment under the provisions of Title XIX of the 1965 Amendments to the Federal Social Security Act. As condition of participating in the Medicaid program, enrolled providers agree to abide by the rules, regulations, policies and procedures governing reimbursement, and to keep and allow access to required records and information.

**The Illinois Insurance Claims Frauds Prevention Act**

34. The Illinois Legislature enacted the Illinois Insurance Claims Frauds Prevention Act ("IICFPA") to combat abusive practices aimed at defrauding private insurance providers. The legislative findings and declarations make clear that it was specifically concerned with the social costs of fraud on private insurance providers, noting that the penalties in the IICFPA are "remedial"

and intended to achieve the "goals of disgorging unlawful profit, restitution, compensating the State for the costs of investigations and prosecution, and alleviating the social costs of increased insurance rates due to fraud." 740 ILCS § 92/5(c).

35. Relevant here, IICFPA subjects any person who violates subsection 5(a) thereof or criminal code Section 17-10.5 ["Insurance fraud"], each addressed sequentially below to civil penalties of between $5,000 and $10,000, plus an assessment of not more than three times the amount of each claim for compensations under a contract of insurance. 740 ILCS § 92/5(b). The IICFPA also vests the court with "the power to grant other equitable relief, including temporary injunctive relief, as is necessary to prevent the transfer, concealment, or dissipation of illegal proceeds, or to protect the public." *Id.*

36. 740 ILCS § 92/5(a) makes it "unlawful to knowingly offer or pay any remuneration directly or indirectly, in cash or in kind, to induce any person to procure clients or patients to obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured person or the person's insurer."

37. Section 17-10.5(a)(1) of the Illinois Criminal Code of 2012 sets forth that a "person commits insurance fraud when he or she knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company or by the making of a false claim or by causing a false claim to be made to a self-insured entity, intending to deprive an insurance company or self-insured entity permanently of the use and benefit of that property." 720 ILCS § 5/17-10.5(a)(1).

38. Section 17-10.5(a)(2) of the Illinois Criminal Code of 2012 sets forth that a "person commits health care benefits fraud against a provider, other than a governmental unit or agency,

when he or she knowingly obtains or attempts to obtain, by deception, health care benefits and that obtaining or attempt to obtain health care benefits does not involve control over property of the provider." 720 ILCS § 5/17-10.5(a)(2).

39. Section 17-10.5(b)(1) of the Illinois Criminal Code of 2012 defines "aggravated insurance fraud" as 3 or more offenses within an 18-month period arising out of separate incidents or transactions. 720 ILCS § 5/17-10.5(b)(a).

40. Section 17-10.5(b)(2) of the Illinois Criminal Code of 2012 further prohibits being an "organizer" of an aggravated insurance fraud, setting forth that a "person commits being an organizer of an aggravated insurance fraud on a private entity conspiracy if aggravated insurance fraud on a private entity forms the basis for a charge of conspiracy under Section 8-2 of this Code and the person occupies a position of organizer, supervisor, financer, or other position of management within the conspiracy." 720 ILCS § 5/17-10.5(b)(2).

41. Section 17-10.5(c) of the Illinois Criminal Code of 2012 sets forth that:

> If aggravated insurance fraud on a private entity forms the basis for charges of conspiracy under Section 8-2 of this Code, the person or persons with whom the accused is alleged to have agreed to commit the 3 or more violations of this Section need not be the same person or persons for each violation, as long as the accused was part of the common scheme or plan to engage in each of the 3 or more alleged violations.

720 ILCS § 5/17-10.5(c).

42. Through its various schemes, described *infra*, Defendants violated the preceding provisions, making or causing fraudulent health care claims to be made to Illinois health care insurers.

**Facts**

43. As Director of Billing, Mitcham oversaw, implemented and participated in all phases of the Company's revenue cycle, as set forth above. She thus has first-hand knowledge of the practices described below as she either submitted the claims for payment herself or directly supervised the employees who submitted them.

44. Prior to the pandemic, Lifescan averaged around $7-8 million per year in revenue. Its business grew exponentially with the onset pandemic, the sudden demand for Covid testing services and the fraudulent billing practices described herein. See, https://www.lifescanlab.com/about/ ("Today, the lab has processed over 1.2 million Covid-19 PCR tests and collected nearly 400,000 swabs, ranking us among the largest laboratories in the nation and a thought leader in the industry.") In 2021, its revenue was around $110 million.

45. As set forth herein, Lifescan submitted claims for payment for Covid and other laboratory testing services to the Federal government, including HRSA, to Medicaid, and to private insurance companies.

46. Based on Relator's knowledge and first-hand experience, approximately 60% of Lifescan's non-Covid related claims are submitted to Medicare, 30% to Medicaid, and 10% to private insurance. Most of Lifescan's claims to private insurers described herein were submitted to Blue Cross Blue Shield, Allied Benefits Systems, Cigna, and Longevity Health Plan ("Longevity"). Longevity is within Cane Investment Partners' portfolio, and as set forth below, Cane Investment shares overlapping ownership and personnel with Lifescan.

**Defendants' Fraud**

**A. Lifescan Provided Nursing Homes with Which It Shares Common Ownership and Familial Interests Discounted Covid Testing Services for their Employees in Exchange for Laboratory Referrals for the Nursing Homes' Residents in Violation of the AKS and FCA's Remuneration in Exchange for Referrals Prohibition.**

47. Yosef Meystel owns Oakton Lab Holdings. Oakton Lab Holdings has a twenty-five percent ownership share of Lifescan. Meystel is Kutoff's brother-in-law.

48. Meystel also owns Aperion Care Nursing Homes. Aperion operates 37 nursing homes in Illinois and Indiana. Aperion is one of Lifescan's largest clients and sources of laboratory service referrals.

49. Lifescan and Kutoff also have a common ownership (more than five percent) and/or familial interests with the Legacy nursing home group and Elevate nursing home group. The Legacy and Elevate nursing home groups are also among its largest clients and referral sources.

50. During Mitcham's employment, nursing homes within the Aperion, Legacy and Elevate nursing home groups referred thousands of claims for Covid and other laboratory tests to Lifescan.

51. As Lifescan's Director of Revenue, Mitcham was responsible for maintaining and overseeing Lifescan's contracts for laboratory services. Based on her personal knowledge, Lifescan does not have written contracts with Aperion, Legacy or Elevate, or any of their affiliates, for Covid testing of nursing home employees, although it does have contracts for testing of the residents. Lifescan did not have written contracts with any nursing homes for testing of employees.

52. Mitcham complained to Kutoff on numerous occasions about Lifescan's lack of contracts for testing of nursing home employees.

53. Nursing homes, including from the Aperion, Legacy, and Symphony networks, routinely referred employees for testing to Lifescan despite the absence of a written contract and

despite the common ownership and familial interests described above.

54. During the pandemic, Lifescan tested employees of dozens of Aperion, Legacy, Elevate and Symphony nursing homes for Covid up to three times per week, and it continued to test employees three times per week, when testing at this frequency was not medically necessary or justified by Covid rates in the community. Lifescan also required its own employees to undergo tests (once per week if vaccinated, twice if not), and it required them to use Lifescan, only. During her employment, Relator complained repeatedly to Defendants that the Covid testing rates were excessive and were not medically justified.

55. Prior to Relator's termination, Kutoff also entered an agreement with the Legacy nursing home group to forgive the balance Lifescan was owed for Covid testing of Legacy employees, and in exchange, ten nursing homes in the Legacy group agreed to refer molecular laboratory tests for Legacy residents to Lifescan going forward. Employees under Mitcham's supervision undertook an expansive project to create a report that falsely itemized (as paid) Covid tests for Legacy employees that in actuality were forgiven pursuant to this under the table, off the books agreement. Legacy advised Lifescan that it intended to use this false report in connection with its tax filings.

56. The prevailing market rate for Covid testing is generally $75 per test, which is the rate for Medicaid reimbursement.

57. Lifescan tested employees in the Symphony nursing home group once per week for Covid. For employees covered by Symphony's group insurance plan, it billed Symphony (not the insurance plan) directly for these tests and charged it at a sub-market rate of $50 per test. For Symphony employees who were not covered by its group plan, Lifescan billed HRSA and/or their third-party insurers at the full $175.46 per test.

58. Zev Alter works for Cane Investments, and he also performed sales functions for Lifescan. Alter told Ms. Mitcham on several occasions during her employment that he gave nursing homes cheaper rates for Covid testing for their employees in exchange for Medicare referrals for tests for the residents. He told Mitcham that he was discounting Lifescan's contracts for nursing home clients to $50 for employee Covid tests, to capture their blood services business, despite that $75 was the prevailing market rate. Alter was paid on a commission basis for sales he made for Lifescan and he now has a five percent ownership interest in Lifescan.

59. Mitcham expressed opposition to Kutoff about these sub-market agreements and *inter alia* told him Lifescan was jeopardizing its contracts with the State by providing services to private entities for lower rates than those it charged to Medicaid. In response, Kutoff directed her not to speak to Alter about this any further.

60. During her employment and as part of her regular job duties, Mitcham personally observed that Defendants charged nursing homes in the Aperion, Elevate, Legacy, Symphony and other nursing home groups for Covid testing of employees at rates of $45-50 per test, which were below-market, pursuant to the agreement described above.

61. Lifescan and Kutoff applied these discounted rates to tests that were not covered by the employees' private insurance plans or HRSA, and instead were to be paid by out-of-pocket by the nursing home clients. Lifescan and Kutoff thus gave these nursing home clients improper discounts for out-of-pocket Covid testing expenses in exchange for other laboratory services that were billed to Medicare, Medicaid and private insurers at the full market rates.

62. Based on Relator's first-hand knowledge, the following nursing homes entered agreements described above with Lifescan for Covid testing at sub-market rates ($45-$50 per test) in exchange for laboratory referrals: Warren Barr South Loop, Warren Barr North Shore, Warren

Barr Living and Rehab, Warren Barr Lincolnshire, Warren Barr Lincoln Park, Uptown Care Center, The Grove of Saint Charles, The Grove of Skokie, The Grove of Northbrook, The Grove of LaGrange Park, The Grove of Fox Valley, The Grove of Evanston, The Grove of Elmhurst, The Grove at the Lake, Symphony of South Shore, Symphony of Orchard Valley, Symphony of Lincoln Park, Symphony of Joliet, Symphony of Hanover Park, Symphony of Crestwood, Symphony of Chicago West, Symphony at Aria, Symphony at 87th St., Pine Acres Rehab & Living Center, Peterson Park Healthcare, Mayfield Health Center, Lakefront Nursing & Rehab, Elevate Care Waukegan, Elevate Care Riverwoods, Elevate Care Northbrook, Elevate Care Niles, Elevate Care Irving Park, Elevate Care Chicago North, Clark Manor, Chalet Living & Rehab, Carlton at the Lake, Bella Terra Wheeling, Bella Terra Streamwood, Bella Terra Morton Grove, Beacon Care Center, Avantara Park Ridge, Avantara Long Grove, Avantara Evergreen Park, Astoria Place, Aperion Care Wilmington, Aperion Care Westchester, Aperion Care West Ridge, Aperion Care West Chicago, Aperion Care Toluca, Aperion Care St. Elmo, Aperion Care Springfield, Aperion Care Spring Valley, Aperion Care Princeton, Aperion Care Plum Grove, Aperion Care Peoria Heights, Aperion Care Oak Lawn, Aperion Care Morton Villa, Aperion Care Midlothian, Aperion Care Mascoutah, Aperion Care Marseilles, Aperion Care Litchfield, Aperion Care Jacksonville, Aperion Care International, Aperion Care Highwood, Aperion Care Glenwood, Aperion Care Forest Park, Aperion Care Fairfield, Aperion Care Evanston, Aperion Care Elgin, Aperion Care Dolton, Aperion Care Chicago Heights, Aperion Care Capitol, Aperion Care Burbank, Aperion Care Bridgeport, Aperion Care Bradley, Aperion Care Bloomington, Aperion Care Angola, Aperion Care Arbors at Michigan City, Aperion Care Demotte, Aperion Care Fort Wayne, Aperion Care Frankfort, Aperion Care Kokomo, Aperion Care Marion, Aperion Care Peru, Aperion Care Spencer, Aperion Care Tolleston Park, Aperion Care University Park, and Aperion Care Waldron.

63. In exchange for these discounted Covid testing services, Lifescan received myriad referrals for tests for laboratory services from the above-noted nursing home clients.

64. Because her employment was terminated, as of this filing, Plaintiff does not have access to records of the specific claims submitted pursuant to these unlawful referral arrangements; those records are in the exclusive control of the Defendants.

65. Based on her first-hand knowledge of Lifescan's revenue cycle, Lifescan received and billed Medicare, Medicaid and private insurers for molecular and other testing services at full rates in exchange for the above-described discounted employee Covid tests. Ms. Mitcham personally submitted or oversaw the submission of myriad claims for payment pursuant to these arrangements.

66. These claims were submitted to Medicare, Medicaid and private insurers through Availty and Waystar, which are national recognized clearing houses that are commonly used for transmission of claims.

67. Defendants' provision of Covid testing services at sub-standard rates in exchange for laboratory referrals was a prohibited "Kickback" in exchange for laboratory services referrals that tainted all related claims for payment.

**B. Lifescan And Kutoff Knowingly Forged Physician's Diagnoses and Signatures in Connection with Claims for Laboratory Tests Submitted to Medicare, Medicaid and Private Insurers.**

68. A supporting diagnosis and signature from the referring doctor is a condition for payment of a claim for laboratory testing to Medicare, Medicaid or private insurance. Without a supporting diagnosis and signature, the claim will be denied. See, 29 C.F.R. 410.32(a), (d).

69. Throughout Relator's employment, physicians associated with Lifescan's nursing home clients including those listed above regularly failed to provide a supporting diagnosis in

connection with laboratory referrals, as required by their contracts with Lifescan and the reimbursement conditions described above.

70. Rather than request this information from nursing homes, Lifescan routinely forged diagnoses for patients and presented claims to Medicare, Medicaid and private insurers for payment based on these forged diagnoses.

71. During her employment, Kutoff provided Relator a "cheat sheet" with a list of diagnoses for each type of laboratory test that she or her direct reports were to enter when a diagnosis was not provided. For instance, if a urinalysis order came in without a supporting diagnosis, she (or others reporting to her) was/were required to enter "urinary tract infection" for the diagnosis, when submitting the claim. Similarly, Lifescan required staff to mark the code reflecting the patient was exposed to the Covid virus for all Covid tests, irrespective of the reason the patient sought the test.

72. Pursuant to these instructions, during her employment, Relator and/or employees under Relator's supervision submitted thousands of claims to Medicare, Medicaid and private insurers for laboratory services based on forged diagnoses.

73. Records of these claims are in the sole possession of the Defendants, and Plaintiff does not have access to them as of this filing due to her termination; however, Plaintiff has firsthand knowledge that claims with forged diagnoses were routinely submitted to Medicare, Medicaid and private insurers in the manner described above because she and employees under her supervision repeatedly and regularly submitted them at Defendants' direction.

74. In or about September 2021, Relator told Kutoff this practice was noncompliant and directed her employees to stop forging diagnoses, but only after thousands of claims based on these forged diagnoses were previously submitted as described above.

75. In addition, based on Relator's direct and first-hand experience, while she was employed by Lifescan, nursing home clients regularly submitted laboratory services requests that were not signed by the referring physicians and did not even identify the name of the referring physician.

76. A signed and valid order by a physician is a condition of payment for claims for laboratory services submitted to Medicare, Medicaid and private insurers. Lifescan had no intent to obtain valid orders for Medicare referrals that it received that were not signed, and to Relator's knowledge, it never obtained such orders. A signed and valid order is also required for claims submitted to HRSA that are administered by United Healthcare.

77. Almost none of the requests for Covid tests Lifescan received were accompanied by signed physician orders, despite that the nursing home groups were testing employees three times per week as described above. See, 42 C.F.R. 410.32(a)(3).

78. In Relator's experience, about half of the requests for molecular tests Lifescan received were accompanied by signed physician orders.

79. Lifescan CEO Kutoff directed Relator to have her staff look at the nursing home facilities' directories and assign at random a physician from the client's directory or the facility's Medical Director to the claim, and thus falsely certify that the referral came from that randomly selected physician. He also instructed Relator (or her reports) to forge the physicians' signatures on the claims where required.

80. In Relator's experience, Lifescan also regularly received orders for laboratory tests that were signed by Registered Nurses, and not a physician. In such cases, Ms. Mitcham or one of her reports entered and supplied the name of a referring physician, as described above.

81. Relator expressed opposition to Kutoff regarding this practice and he replied that a

physician's signature was not necessary, all that is required is an "intent" to sign.

82. During her employment, pursuant to Kutoff's express instruction, Relator's staff submitted thousands of claims to Medicare, Medicaid and private insurers with forged physicians on Lifescan's behalf. For each such claim, they falsely certified the name of the referring physician was true and accurate.

**C. Lifescan and Kutoff Knowingly Submitted Claims to the U.S. Health Resources and Service Administration's (HRSA's) Program for Covid Testing Services for Uninsured Individuals That Were Covered by Nursing Home Employees' Private Insurance Carriers.**

83. Throughout her employment during the pandemic, Lifescan submitted thousands of claims to U.S. Health Resources and Service Administration (HRSA) for reimbursement Covid tests of nursing home employees that were also covered by the employees' private insurance policies.

84. During the pandemic, HRSA administered a program funded by the Federal Government to reimburse healthcare providers for testing services provided to uninsured Americans.

85. Pursuant to Defendants' express instructions and directives, Mitcham and employees under her direction submitted thousands of claims to HRSA for employees who Lifescan knew were covered by private insurance policies, for instance, employees of Aperion and/or other nursing home groups with whom it had close ties as described above.

86. Records of these claims are in the sole possession of the Defendants, and Plaintiff does not have access to them as of this filing due to her termination.

87. Lifescan also billed private insurers for these claims. In many instances, Lifescan billed patients' insurance providers without the patients' consent. Numerous employees called

Lifescan and complained to Mitcham and others that their insurance providers had been billed for Covid testing services and that the frequency of the tests was greater than necessary.

88. On occasions when information regarding nursing home employees' insurance was not provided, Lifescan employees "phished" the Medicaid/Medicare databases to determine whether they were eligible for coverage, in violation of Medicaid's prohibition on "phishing."

89. Additionally, due to the frequency of testing (three times per week), private insurance carriers such as BCBS and Cigna rejected claims for employee Covid tests because the policies did not cover surveillance testing. In such instances, Lifescan submitted the claims to HRSA and falsely certified the patients were "uninsured."

90. For each such claim submitted to HRSA, Defendants were required to and did certify that the tests were provided to a patient who was uninsured. These certifications were false.

91. Relator repeatedly complained to Kutoff that these claims were false and were "double-billing" from both private insurers and the federal government. Kutoff dismissed her complaints.

**D. Lifescan and Kutoff Knowingly Submitted Claims for Covid Testing Which Incorrectly Identified the Patients' Names and Social Security Numbers.**

92. In or about early 2021, Lifescan's Information Technology vendor undertook a project to modify its patient database so that only the last four digits of the patients' social security numbers would be displayed.

93. In or about February and November 2021, Defendants discovered that during this project, parts of the patient database had become jumbled, and thousands of patient names were incorrectly associated with other patients' social security numbers and identifiers.

94. Defendants knowingly submitted claims for laboratory tests to Medicare, Medicaid and private insurers which incorrectly identified the patients due to the flawed data maintained in

Lifescan's patient database.

95. As a result, of the database issue, numerous patients received test results that were from samples other than their own.

96. A Lead/Supervisor who reported to Mitcham discovered the error and brought it to Mitcham's attention. At Mitcham's direction, she reported the issue to Lifescan's Laboratory Manager who directed them to 'do nothing further.' Lifescan did not advise these patients of the database issues or that they received other patients' test results.

97. Relator has firsthand knowledge of claims that were submitted to Medicare, Medicaid and private insurers because she and/or employees under her supervision submitted them on Defendants' behalf. This information is solely in Defendants' control at this time, due to her termination.

98. Relator told Kutoff on numerous occasions that Lifescan needed to reimburse HRSA for claims that were paid by the employees' private insurance carriers. Kutoff refused to set up a reimbursement plan and told her that he would wait to see if Lifescan was audited.

**E. Lifescan And Kutoff Knowingly Submitted Claims to the Federal Government and Private Insurers for Covid Testing Services Provided to Nursing Home Employees That Were and/or Should Have Been Paid by Federal Grants Awarded to the Nursing Home Clients.**

99. During the pandemic, nursing homes in the Aperion and Legacy groups and others received federal grants to pay for Covid testing for its employees. Aperion, for instance, had its own laboratory facility and was capable of conducting its own Covid tests funded by these grants.

100. Mitcham told Kutoff during her employment that Covid testing claims should be submitted to Aperion and the other homes so they could be paid for by the grants, not HRSA. She expressly told Kutoff that submission of claims covered by the grants was "double dipping."

101. Throughout the pandemic, Lifescan billed private insurers or HRSA for employee

Covid tests that it had previously been paid for by these grants. Relator personally submitted such claims on hundreds if not thousands of occasions, based on Defendants' instruction and directive.

102. Relator told Kutoff on numerous occasions that Lifescan needed to reimburse HRSA for claims that were paid by federal grants and/or the employees' private insurance carriers. Kutoff refused to set up a repayment plan and told her that he would wait to see if Lifescan was audited.

103. Records relating to the claims submitted are in the sole custody of Defendants, and Plaintiff does not have access to them at this time.

**F. Lifescan Knowingly Submitted Claims for Covid Testing Swabs that It Did Not Perform**

104. On numerous occasions throughout the pandemic, Lifescan submitted claims that falsely represented it had performed the swab on the patient in connection with Covid tests when in reality, the patient or other personnel (for instance, employees of pop-up Covid testing companies) actually performed the swab.

105. Kutoff instructed Lifescan's laboratory personnel to mark that the swab had been done by Lifescan in such cases. Medicare and Medicaid, for instance, reimburse at a rate of $23.46 for each swab performed. Lifescan thus repeatedly billed for swab services that it did not perform, and due to the prevalence of this practice, Relator estimates thousands of false claims were submitted.

106. Throughout Relator's employment, Lifescan employed a sales team of approximately 6-15 employees. Each of these employees received a payment of $.25 per swab in connection with sales they made.

107. During her employment, patients called Relator to complain that their insurance providers had been billed for swabs they performed themselves.

108. In or about October or November 2021, Lifescan ceased charging for swab services it did not perform as a result of Relator's complaints; however, it did not reimburse payers for prior overpayments.

### G. Defendants Terminated Plaintiff's Employment in Retaliation for Her Opposition to the Above Fraudulent Practices

109. Throughout her employment, Relator voiced opposition to the above-described practices to Kutoff and other Lifescan executives, including as described above. Among other things, she opposed Lifescan's provision of sub-market Covid testing services in exchange for laboratory referrals, described above. She told them Lifescan cannot continue to bill the government for tests that are covered by federal grants, those claims should be submitted to the nursing homes for payment, and that Lifescan was "doubledipping." She stated that Lifescan cannot move forward with billing claims until the database issues described above were corrected and patient identifiers were fully verified. She opposed Defendants' use of forged diagnoses and ultimately directed her staff to stop forging diagnoses. She opposed and attempted to stop the other practices described above. She repeatedly told Defendants including Kutoff that the practices described above were illegal and fraudulent.

110. Defendants hired Elena McGannon as Chief Revenue Officer in December 2021, and at such time she became Plaintiff's direct supervisor. Prior to that, Plaintiff reported to Kutoff.

111. After McGannon was hired, Plaintiff reported the issues described above to her, and provided documentation supporting the same. Among other things, Plaintiff told her that Lifescan had been submitting claims for payment with forged and false supporting information, that staff had been directed to use a "cheat sheet," and that these practices were noncompliant. Relator complained that it was unnecessary to continue to test nursing home employees for Covid three times per week in light of current rates of community spread, and that this issue was being

monitored by the Illinois Department of Public Health. Plaintiff told her that Lifescan was improperly billing private insurers for tests that were covered by federal grants and that this was "double dipping." She told McGannon the practices were fraudulent and illegal.

112. In response to Relator's opposition to the above practices, McGannon asked 'why do you care?' She told Relator, 'We're not changing anything, we're going forward with things the way they are,' or similar words to that effect.

113. In retaliation for Relator's complaints, opposition, and efforts to stop the above-described practices, in March 2022, Defendants issued a "Corrective Action Notice" to Mitcham for purported "Unsatisfactory Performance of Duties." The allegations in the "Corrective Action Notice" were false and pretextual.

114. On March 24, 2022, Defendants subsequently terminated Plaintiff based on these false and pretextual allegations.

115. Defendants stated that Mitcham was terminated because she was not a "team player," which was a veiled reference to her opposition to the fraudulent billing practices, described above.

116. Defendants' termination of Plaintiff's employment was in retaliation for her opposition to and refusal to participate in the fraud schemes, described above.

117. Plaintiff suffered significant damages as a result of the retaliatory termination of her employment, including lost wages, benefits, emotional distress and damage to her reputation and career.

**Count I**
**Violation of False Claims Act**

118. Plaintiff-Relator realleges the preceding paragraphs as if fully set forth herein.

119. 31 U.S.C. §3729(a)(1)(A) provides liability for any person who knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval.

120. On May 20, 2009, 31 U.S.C. § 3729(a) was amended to provide, in relevant part, liability for: (1) any person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval.

121. Defendants knowingly presented or caused to be presented false and fraudulent claims for payment or approval to HRSA, Medicare, Medicaid and the United States.

122. Defendants knowingly caused to be presented, directly or indirectly, false and fraudulent claims for payment or approval to the United States.

123. Defendants knowingly retained and continue to retain overpayments due and owing to the United States.

124. Defendants knew these claims for payment were false or fraudulent, or were deliberately ignorant of the truth, or acted in reckless disregard of whether claims were true.

125. Because of these false or fraudulent claims presented or caused to be presented by the Defendants, the United States has suffered damages.

126. Defendants are jointly and severally liable to the United States for treble damages under the False Claims Act, in an amount to be determined at trial, plus a civil penalty of $5,000 to $10,000 for each false claim presented or caused to be presented by Defendants prior to

November 2, 2015, between $10,781 and $21,563 per false claim thereafter and between $10,957 and $21,916 for each false claim presented or caused to be presented after February 3, 2017.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment against the Defendants as follows:

1. Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, *et seq*;
2. That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged in this complaint, as 31 U.S.C. § 3729, *et seq* provides;
3. That civil penalties of $5,000 to $10,000 be imposed for each and every false claim that the Defendants caused to be presented to the United States prior to November 2, 2015 and between $10,781 and $21,563 per false claim thereafter, and between $10,957 and $21,916 for each false claim presented or caused to be presented after February 3, 2017, and including treble damages.
4. Relator be awarded the maximum relator's share allowed pursuant to the False Claims Act, 31 U.S.C. § 3730(d);
5. Relator be awarded all costs of this action, including attorney's fees, costs, and expenses pursuant to 31 U.S.C. § 3730(d);
6. Defendants be enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court; and
7. That this Court award the United States and the Relator such other relief that it deems just and proper.

## Count II
## Anti-Kickback Violations

127. Plaintiff-Relator realleges the preceding paragraphs as if fully set forth herein

128. As set forth above, Lifescan and Kutoff knowingly paid remuneration directly or indirectly, overtly or covertly in cash or in kind to Mystel and nursing homes he owned to induce them to purchase or order goods covered in whole or in part in violation of the Anti-Kickback Law.

129. These payments were in the form of subsidizing employee salaries, providing free services, and providing materials at a cost of less than fair market value.

130. As a result, the government has been damaged.

131. **WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment against the Defendants as follows:

1. Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729, *et seq*;
2. That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged in this complaint, as 31 U.S.C. § 3729, *et seq* provides;
3. That civil penalties of $5,000 to $10,000 be imposed for each and every false claim that the Defendants caused to be presented to the United States prior to November 2, 2015 and between $10,781 and $21,563 per false claim thereafter, and between $10,957 and $21,916 for each false claim presented or caused to be presented after February 3, 2017, and including treble damages.
4. Relator be awarded the maximum relator's share allowed pursuant to the False Claims Act, 31 U.S.C. § 3730(d);
5. Relator be awarded all costs of this action, including attorney's fees, costs, and expenses pursuant to 31 U.S.C. § 3730(d);
6. Defendants be enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court; and
7. That this Court award the United States and the Relator such other relief that it deems just and proper.

## Count III
## Violations of the Illinois False Claims Act

132. Plaintiff-Relator realleges each and every allegation contained in the preceding paragraphs as thought fully set forth herein.

133. This is a claim for treble damages and penalties under the Illinois False Claims Act.

134. By virtue of the acts described above, Defendants knowingly presented or caused to be presented false or fraudulent claims to the Illinois State Government for payment or approval.

135. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records or statements and omitted material facts to induce the State of Illinois to approve and pay or subsidize such false and fraudulent claims.

136. As a result, Illinois State monies were lost through the payment of such false and fraudulent claims.

137. By reasons of the Defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in substantial amounts to be determined at trial. Additionally, the Illinois State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

**WHEREFORE,** Relator prays for judgment against the Defendants as follows:

1. Defendants cease and desist from violating the IFCA;
2. This Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of the IFCA.
3. This Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Illinois has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of the IFCA.
4. This Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Illinois has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of 740 Ill. Comp. Stat. § 175/3(a);
5. Relator be awarded the maximum amount allowed under the IFCA;
6. Relator be awarded her relator's share under the IFCA;
7. Relator be awarded all costs of this action, including attorneys' fees and expenses; and
8. Relator recover such other relief as the Court deems just and proper.

## Count IV
## Retaliation – False Claims Act
(Against Lifescan Only)

138. The Plaintiff re-alleges and incorporates by reference the prior paragraphs.

139. The FCA's anti-retaliation provisions provide in relevant part as follows: "Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and

conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 29 U.S.C. 3730(h).

140. As set forth above, Plaintiff opposed, complained and attempted to stop Defendants' repeated submissions of the above-described fraudulent claims for payment to the federal government.

141. As set forth above, Lifescan retaliated against Mitcham for this opposition by issuing a bogus and pretextual "corrective action" plan, and subsequently terminating her for pretextual reasons.

142. Mitcham has suffered damages as a result of Defendants' retaliation and the loss of her employment.

**WHEREFORE,** Relator prays for judgment against the Defendants as follows:

a. Enter judgment finding Defendant retaliated against and terminated her employment unlawfully violation of the FCA;
b. Reinstate Plaintiff to her previous position or award front pay;
c. Award Plaintiff her lost wages, value of lost benefits and other monetary losses caused by Defendant's unlawful termination of her employment;
d. Award Plaintiff 2 times the amount of back pay pursuant to 29 U.S.C. 3730(h);
e. Award Plaintiff interest on the back pay;
f. Award Plaintiff compensation for special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees; and,
g. Such other relief the Court determines is just and appropriate.

## Count V
## Retaliation – Illinois False Claims Act

143. Plaintiff hereby alleges and incorporates her prior allegations.

144. The Illinois False Claim Act's anti-retaliation provisions provide: "In general, any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted,

suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent, or associated others in furtherance of an action under this Section or other efforts to stop one or more violations of this Act." 740 ILCS 175/4.

145. As set forth above, Plaintiff opposed, complained and attempted to stop Defendants' repeated submissions of the above-described fraudulent claims for payment to the federal government.

146. As set forth above, Lifescan retaliated against Mitcham for this opposition by issuing a bogus and pretextual "corrective action" plan, and subsequently terminating her for pretextual reasons.

147. Mitcham has suffered damages as a result of Defendants' retaliation and the loss of her employment.

**WHEREFORE,** Relator prays for judgment against the Defendants as follows:

a. Enter judgment finding Defendant retaliated against and terminated her employment unlawfully violation of the IFCA;
b. Reinstate Plaintiff to her previous position or award front pay;
c. Award Plaintiff her lost wages, value of lost benefits and other monetary losses caused by Defendant's unlawful termination of her employment;
d. Award Plaintiff 2 times the amount of back pay pursuant to the IIFCA;
e. Award Plaintiff interest on the back pay;
f. Award Plaintiff compensation for special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees; and,
g. Such other relief the Court determines is just and appropriate.

**Count VI**
**Retaliation– IICFPA**

148. Plaintiff hereby alleges and incorporates her prior allegations.

149. The IICFPA's anti-retaliation provision provides in relevant part: "An employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated

against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this Act, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this Act, shall be entitled to all relief necessary to make the employee whole." 740 ILCS 92/40.

150. As set forth above, Plaintiff investigated, opposed, complained and attempted to stop Defendants' repeated submissions of the above-described fraudulent claims for payment to the federal government.

151. As set forth above, Lifescan retaliated against Mitcham for this opposition by issuing a bogus and pretextual "corrective action" plan, and subsequently terminating her for pretextual reasons.

152. Mitcham has suffered damages as a result of Defendants' retaliation and the loss of her employment.

**WHEREFORE,** Relator prays for judgment against the Defendants as follows:

a. Enter judgment finding Defendant retaliated against and terminated her employment unlawfully violation of the IICFPA;
b. Reinstate Plaintiff to her previous position or award front pay;
c. Award Plaintiff her lost wages, value of lost benefits and other monetary losses caused by Defendant's unlawful termination of her employment;
d. Award Plaintiff 2 times the amount of back pay pursuant to the IICFPA;
e. Award Plaintiff interest on the back pay;
f. Award Plaintiff compensation for special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees; and,
g. Such other relief the Court determines is just and appropriate.

**Count VII**
**Retaliation - Illinois Whistleblower Act**
**(Against Defendants Lifescan and Kutoff)**

153. Mitcham repeats and realleges the paragraphs set forth above as if set forth herein.

154. At all relevant times, Defendants were Plaintiff's "employer" within the meaning of the IWA. 740 ILCS 174/5.

155. At all relevant times during her employment Mitcham was an "employee" of Defendants within the meaning of the IWA. 740 ILCS 174/5.

156. Section 20 of the IWA provides: "An employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation, including, but not limited to, violations of the Freedom of Information Act."

157. Section 10 of the IWA provides: "An employer may not make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency if the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation." 740 ILCS 174/10.

158. Defendants retaliated against Mitcham in violation of the above quoted sections of the IWA for opposing and refusing to participate in its scheme described above and to prevent her (and others) from reporting it by terminating her employment and sending a message to the other employees. As such, Defendants created a *de facto* rule prohibiting employees from reporting their illegal conduct to the authorities.

159. Defendant Kutoff acted within the scope of his authority express or implied when dealing with Mitcham and he was, at all relevant times, an "employer" within the meaning of the IWA. 740 ILCS 174/5.

160. Defendants' above-described retaliatory conduct violated Sections 10 and 20 of the IWA.

161. Mitcham has suffered financial and pecuniary loss, emotional distress, and damage to her career as a result of Defendants' illegal retaliation and termination of her employment described above.

**WHEREFORE**, Plaintiff respectfully requests judgment in her favor and for relief as follows:

a. Enter judgment finding Defendants terminated her employment unlawfully violation of the Illinois Whistleblower Act;
b. Reinstate Plaintiff to her previous position or award front pay;
c. Award Plaintiff her lost wages, value of lost benefits and other monetary losses caused by Defendants' unlawful termination of her employment;
d. Award Plaintiff compensatory damages and damages for emotional distress;
e. Award Plaintiff punitive damages;
f. Award Plaintiff attorneys' fees and litigation costs as authorized by the IWA, 740 ILCS 174/30; and
g. Such other relief the Court determines is just and appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all claims alleged herein

Dated: July 26, 2022

Respectfully submitted,

By: /s/David Fish
One of Plaintiff's Attorneys

David Fish
FISH POTTER BOLAÑOS, P.C.
200 E. 5th Avenue, Suite 123
Naperville, IL 60565
(331) 425-7083
dfish@fishlawfirm.com
docketing@fishlawfirm.com

## CERTIFICATE OF SERVICE

The undersigned hereby affirms that on July 26, 2022, she caused a copy of the foregoing Complaint, to be served as noted below, upon the following persons:

| | |
|---|---|
| Linda A. Wawzenski,<br>Chief, Medicare Fraud Unit<br>Assistant United States Attorney<br>Northern District of Illinois<br>219 S. Dearborn St., 5th Floor<br>Chicago, IL 60604<br>Linda.wawzenski@usdoj.gov<br><br>By USAFX and Delivery | Kwame Raoul<br>Illinois Attorney General<br>% Harpreet Khera<br>Chief, Special Litigation Division<br>100 W. Randolph Street – 13th Floor<br>Chicago, IL 60601<br>Harpreet.Khera@ilag.gov<br><br>By Mail, Electronic Mail or Delivery |
| Merrick B. Garland<br>Attorney General of the United States<br>Attn: Jamie Yavelberg<br>Director, Civil Division - Fraud Section<br>United States Department of Justice<br>950 Pennsylvania Avenue, NW<br>Washington, D.C. 20530-0001<br>civilfrauds.quitams@usdoj.gov **for**<br>jamie.yavelberg@usdoj.gov<br><br>By certified mail # 03122120000108075398 | Kwame Raoul<br>Illinois Attorney General<br>%Heather Tullio D'Orazio<br>Deputy Bureau Chief Medicaid Fraud Bureau<br>Office of the Illinois Attorney General<br>100 West Randolph Street, 13th Floor<br>Chicago, Illinois 60601<br>Heather.DOrazio@ilag.gov<br><br>By Mail, Electronic Mail or Delivery |
| Kim Foxx<br>Cook County State's Attorney<br>% Prathima Yeddanapudi, Supervisor<br>Advice, Transactions & Litigation Unit<br>69 W. Washington St. – Suite 3200<br>Chicago, IL 60602<br>prathima.yeddanapudi@cookcountyil.gov<br><br>By Mail, Electronic Mail or Delivery | |

/s/ Robin Potter
Robin Potter